1  Philip J. Dichter, Esq. (CA SBN 065636)
   20848 Pacific Coast Highway
2  Malibu, CA 90265
   Tel: 310-456-5679
3  Email: pjd90265@aol.com

4  Attorney for Plaintiffs, Dichter-Mad Family Partners, LLP,
   Philip Dichter, and Claudia Gvirtzman Dichter
5
   Richard H. Gordon
6  504 N. Alpine Dr.
   Beverly Hills, CA 90210
7  Tel: 310-962-1267
   Email: rhgordon7@gmail.com
8
   In Pro Per
9

10
11              **UNITED STATES DISTRICT COURT**
                **CENTRAL DISTRICT OF CALIFORNIA**
12
13  DICHTER-MAD FAMILY PARTNERS, LLP,   ) Case No.:
    Philip Dichter, Claudia Gvirtzman   ) CV09-9061 SVW (FMOx)
14  Dichter, and Richard H. Gordon,     )
                                        ) **COMPLAINT**
15               Plaintiffs,            )
                                        )
16         vs.                          )
                                        )
17  UNITED STATES OF AMERICA, SECURITIES )
    EXCHANGE COMMISSION, and Does 1 - 10 )
18                                       )
                 Defendants.            )
19  ─────────────────────────────────

20  Plaintiffs, Dichter-Mad Family Partners, LLP, Philip Dichter, and Claudia

21  Gvirtzman Dichter (collectively, "Plaintiffs"), by their attorney, Philip

22  J. Dichter, Esq., and Plaintiff, Richard H. Gordon, In Pro Per, for their

23  Complaint against defendants, the United States of America (the "United

24  States") and the Securities and Exchange Commission (the "SEC") allege the

25  following allege the following based upon the investigation conducted by

26  Plaintiffs and by Plaintiffs' counsel, which included, among other things,

27  review of an interview with Bernard Madoff; reviews of interviews with

28  other individuals with knowledge of the events alleged herein; a review of

                                     1



12/10/2009 11:03:11 AM  Receipt #: 127862
Cashier : KPAGE [LA 1-1]
Paid by: RICHARD GORDON ATTORNEY AT LAW
2:CV09-09061
2010-086900        5 - Civil Filing Fee(1)
Amount :                      $60.00
2:CV09-09061
2010-510000       11 - Special Fund F/F(1)
Amount :                     $190.00
2:CV09-09061
2010-086400        Filing Fee - Special(1)
Amount :                     $100.00
Check Payment: 1189 /         350.00

public documents, including the Report of the Office of the Inspector General of the SEC and its forensic experts, dated August 31, 2009, court filings by the United States Securities and Exchange Commission ("SEC"), the Trustee Irving Picard, and others; news reports; and other information and documents provided to Plaintiffs. Plaintiffs believe that substantial evidentiary support exists for the allegations set forth herein. All of the allegations herein are based upon information and belief after an extensive investigation except as to those allegations regarding Plaintiffs, which are made upon knowledge:

## NATURE OF THE ACTION

1.      This complaint seeks money damages suffered by Plaintiffs, arising from the serial, negligence and gross negligence of the United States Securities and Exchange Commission ("SEC")[1] in performing its non-discretionary functions during its multiple investigations and examinations of Bernard Madoff ("Madoff') and his firm, Bernard L. Madoff Investment Securities LLC ("BMIS"), triggered primarily by its receipt of numerous detailed, credible complaints between 1992 and 2008. As the Office of the Inspector General of the SEC (the "OIG")[2] and its forensic experts have determined in its report dated August 31, 2009 (the "Report"), the SEC had countless opportunities to stop the Ponzi scheme Madoff operated over sixteen years, and botched all of them. (A copy of the Report is annexed

---

[1]  The SEC has primary responsibility for enforcing the federal securities laws and regulating the securities industry, the nation's stock and options exchanges, and other electronic securities markets. Its mission "is to protect investors, maintain fair, orderly, and efficient markets, and facilitate capital formation." (http://www.sec.gov/aboutlwhatwedo.shtml, accessed October 13,2009)

[2] The SEC's Office of the Inspector General "is an independent office within the U.S. Securities and Exchange Commission (SEC or Commission) that conducts audits of programs and operations of the Commission and investigations into allegations of misconduct by staff or contractors. The mission of the OIG is to detect fraud, waste and abuse, and to promote integrity, economy, efficiency and effectiveness, in the Commission's programs and operations." *(see* http://www.sec-oig.gov/, accessed October 13,2009)

hereto as Exhibit "A")[3].

2.        Through its negligent actions and inactions (hereinafter collectively referred to as the "SEC's negligence"), the SEC caused Madoff's scheme to continue, perpetuate, and expand, eventually resulting in billions in losses by investors, and directly caused Plaintiffs to suffer monetary losses. The SEC owed a duty of care to all of those investors, including Plaintiffs. The SEC breached its duty of care and, in doing so, proximately caused Plaintiffs' injuries, in that those injuries were the natural, probable, and foreseeable outcome of the SEC's failure to terminate Madoff's Ponzi scheme despite its multiple opportunities to do so. The fact that Madoff's own actions also contributed to Plaintiffs' injuries does not protect the SEC from liability, because the SEC's negligence was both a substantial factor in bringing about those injuries, and because those injuries would not have occurred but for the SEC's negligence. Had the SEC carried out its functions with reasonable due care, plaintiffs would not have suffered monetary losses.

3.        The SEC's negligence is not shielded by the doctrine of sovereign immunity because it did not occur in the performance of its discretionary functions. Those members of the SEC staff who investigated Madoff from time to time were not crafting policy or making rules. Rather, the SEC staff was carrying out their usual and regular obligations to examine and investigate its registrants and potential wrongdoing within the context of defined

---

[3] The factual allegations contained herein are based principally on the findings of the Report, which relied on the OIG's extensive review of documents and sworn testimony obtained from numerous current and former SEC employees, email and document searches, document requests to third parties, and a team of experts and consultants with "unique and specialized experience." (Report pp. 5-6) To the extent that the allegations made herein are not expressly set forth in the Report, they are based on reasonable inferences drawn therefrom, or upon plaintiffs' information and belief. To the extent that factual allegations or determinations made in the report are not expressly restated herein, they are hereby fully incorporated by reference.

policies and routine common-sense practices[4], and failed to fulfill their duties.

4.         Beginning in 1992, and continuing through 2008, the SEC received at least eight complaints or submissions indicating that Madoff was operating a Ponzi scheme. In response, the SEC commenced four formal investigations or examinations, as well as several informal reviews or inquiries[5]. But throughout the course of those many inquiries, the SEC staff consistently disregarded SEC policy that "all relevant information contained in tips and complaints *must* be sufficiently vetted" and that, even if the staff is skeptical, they "*must* still review all of the allegations before any conclusions can be made with regard to the legitimacy of such allegations." (Report p. 167, n. 104) (emphasis added)[6] The SEC's negligence, incompetence, inexperience, inattentiveness, and laziness, caused Madoff and BMIS to pass through the SEC's investigations without being discovered as a Ponzi scheme. Indeed, over many years, although the SEC was presented with innumerable smoking guns unveiling Madoff's wrongdoing, the SEC staff failed to follow up and failed to recognize any of them for what they were-the keys to unraveling possibly the largest financial fraud in history.

5.         The SEC's negligence took many forms over the course of its

---

[4] Throughout this complaint, for the sake of simplicity, "policies" refer to any formal or informal policies, rules, standards, guidelines, procedures, codes, routines or other directives implemented by the SEC to govern the conduct of its agents. "Practices" refers to common-sense standards of conduct required of SEC agents in the course of exercising their duties with reasonable due care, regardless of whether the SEC had promulgated any formal or informal policies with respect to that conduct.

[5] The OIG identified several other investigations, inquiries and examinations other than those described in this Complaint, but the OIG concluded that none of them were related to, or could have exposed, Madoff's Ponzi scheme. Plaintiffs have declined to include a discussion of those other investigations, inquiries and examinations in this Complaint in reliance on the OIG's conclusion, but specifically reserve all of their rights to amend their pleading to incorporate them in accordance with facts and circumstances as they develop.

[6] For the sake of clarity, throughout this Complaint, the names of SEC staffers are omitted and are all simply referred to as staff, or where appropriate, "junior" staff or "supervising" staff. Full names of the relevant individuals are provided in the Report. Likewise, all varieties of SEC inquiries, whether informal reviews, examinations, or investigations, are referred to as "investigations." A more complete description of the technical variations between the relevant terms is set forth in the Report.

multiple investigations of Madoff. Inquiries were delegated from SEC teams that had expertise in financial fraud to ones that did not. Critical tasks were assigned to junior staffers who had no relevant training or experience. Those junior staffers were at best functionally unsupervised, and at worst, were given supervision that actively discouraged them from pursuing leads. Policies and practices regarding case opening and closing memoranda, investigation planning memoranda, and communications between SEC offices and teams were disregarded. Investigative teams consistently failed to contact third parties to confirm Madoff's claimed trading activities, even when called for by the teams' own plans for their investigations. Petty jealousies and inter-office rivalries led to tipsters being disregarded and key resources of other SEC teams going unutilized. And clouding every step of the SEC's various investigations was a perception of Madoff's power and influence that cowed staff members into giving him the benefit of the doubt, despite their suspicions--or even knowledge-that he had lied to them.

6.      For at least sixteen years, the SEC's failure to follow proper investigative procedures and practices, or even to observe simple common sense, allowed Madoff to perpetuate his scheme, drawing in innumerable new victims who were totally unaware that the government agency sworn to protect them had fallen down on the job.

7.      The SEC must be held accountable and responsible for its own negligent actions and inactions that directly and proximately caused the loss of billions of investor funds. The SEC investigated Madoff on multiple occasions over sixteen years and had innumerable chances to expose the

fraud. The SEC failed to do so because the assigned staff committed numerous negligent, non-discretionary acts and inactions due chiefly to their inexperience, incompetence, bureaucratic pettiness, laziness, inattentiveness, and an agency culture of deference to powerful industry figures. Rather than protect the investing public by uncovering and disclosing that Madoff was perpetuating a fraudulent scheme, the SEC's ineptitude directly resulted in Madoff using, to the detriment of his many victims, the multiple, implied "clean bills of health" issued by the SEC to Madoff to market his scheme to unsuspecting victims, vastly expanding his fraudulent web.

8.      Plaintiffs here were among those victimized by Madoff. Plaintiffs made their investments in reliance on Madoff's reputation, clean regulatory record, and the SEC's implied stamp of approval.

9.      After the Madoff scheme collapsed, the then-Chairman of the SEC made the following statement - and preliminary admission of the SEC's negligence - as he was announcing the investigation that would be conducted by OIG:

> Our initial findings have been deeply troubling. The Commission has learned that credible and specific allegations regarding Mr. Madoff's financial wrongdoing, going back to at least 1999, were repeatedly brought to the attention of SEC staff, but were never recommended to the Commission for action. I am gravely concerned by the apparent multiple failures over at least a decade to thoroughly investigate these allegations or at any point to seek formal authority to pursue them.
>
> Moreover, a consequence of the failure to seek a formal order of investigation from the Commission is that subpoena power was not used to obtain information, but rather the staff relied upon information voluntarily produced by Mr. Madoff and his firm.
>
> In response, after consultation with the Commission, I have directed a full and immediate review of the past allegations regarding Mr. Madoff and his firm and the reasons they were not

found credible, to be led by the SEC's Inspector General. The
review will also cover the internal policies at the SEC governing
when allegations such as those in this case should be raised to
the Commission level, whether those policies were followed, and
whether improvements to those policies are necessary.

(A copy of the full press release is annexed hereto as Exhibit B.)

10.     The OIG's Report revealed real and meaningful "multiple failures"

of the SEC, and that its staff failed to follow the SEC's own internal

policies and practices and the common-sense dictates of ordinary due care

during the SEC's multiple investigations of Madoff. Indeed, as Chairperson

Schapiro stated publicly on September 4, 2009 in a statement regarding the

OIG report, the SEC's negligence was a "failure we continue to regret."

11.     The OIG's Report concluded as follows:

The OIG investigation found that the SEC received numerous
substantive complaints since 1992 that raised significant red
flags concerning Madoff's hedge fund operations and should have
led to questions about whether Madoff was actually engaged in
trading and should have led to a thorough examination and/or
investigation of the possibility that Madoff was operating a
Ponzi scheme. However, the OIG found that although the SEC
conducted five examinations and investigations of Madoff based
upon these substantive complaints, they never took the necessary
and basic steps to determine if Madoff was misrepresenting his
trading. We also found that had these efforts been made with
appropriate follow-up, the SEC could have uncovered the Ponzi
scheme well before Madoff confessed.

The OIG found that the conduct of the examinations and
investigations was similar in that they were generally conducted
by inexperienced personnel, not planned adequately, and were too
limited in scope. While examiners and investigators discovered
suspicious information and evidence and caught Madoff in
contradictions and inconsistencies, they either disregarded these
concerns or relied inappropriately upon Madoff's representations
and documentation in dismissing them. Further, the SEC examiners
and investigators failed to understand the complexities of
Madoff's trading practices and the importance of verifying his
returns with independent third parties.

The OIG did not find that the failure of the SEC to uncover
Madoff's Ponzi scheme was related to the misconduct of a
particular individual or individuals, and found no inappropriate
influence from senior-level officials. We also did not find that
any improper professional, social, or financial relationship on
the part of any former or current SEC employee impacted the
examinations or investigations.

Rather, there were systematic breakdowns in the manner in which

the SEC conducted its examinations and investigations, and for that reason, the OIG is issuing under separate cover two audit reports providing the SEC with specific and concrete recommendations to improve the operations of both OCIE [Office of Compliance Inspection and Examinations] and Enforcement.

The OIG also recommends that the Chairman carefully review this ROI and share with OCIE and Enforcement management, the portions of this ROI that relate to the performance failures by those employees who still work at the SEC, so that appropriate action (which may include performance-based action, as appropriate) is taken, on an employee-by-employee basis, to ensure that future examinations and investigations are conducted in a more appropriate manner and the mistakes and failures outlined in this ROI are not repeated.

(Report pp. 456-457)

12.      The SEC did not have "discretion" to conduct its investigations with the lack of reasonable due care revealed in the Report, which evidenced such outrageous, wanton indifference to public safety as to constitute gross negligence. The misconduct of the SEC staff had nothing to due with rule-making or policy analysis and implementation. Rather, this is a case of individual agency staff members with no rule-making function failing to follow the SEC's clear policies and practices, while the entity subject to SEC regulation engaged in a massive fraudulent scheme, resulting in damages to plaintiffs

13.      The SEC cannot evade accountability with a shield of immunity that is designed to be reserved for policy decisions. Nor can the SEC seek refuge in a warped premise that because the damage inflicted was so vast, it is somehow incapable of being remedied civilly. Plaintiffs respectfully request that the Court award them compensatory damages in the amount of their net principal investments in Madoff's scheme, plus reasonable attorneys' fees, costs, and such other and further relief as the Court deems just and proper.

## THE PARTIES

14.      Plaintiff Dichter-Mad Family Partners, LLP, is a limited

1  liability partnership duly constituted under the laws of the State of

2  Florida.

3  15.        Plaintiffs, Philip Dichter and Claudia Gvirtzman Dichter, are

4  individuals, are husband and wife, are each a resident of the State of

5  California, and each individually was an original (two of the original

6  three) partners in Dichter-Mad Family Partners, LLP.

7  16.        Plaintiff Richard H. Gordon is a resident of the State of

8  California.

9  17.        Defendant United States of America is the federal government

10 constituted by the Constitution of the United States, and is the proper

11 party defendant under the Federal Tort Claims Act ("FTCA") in this action

12 for damages resulting from the negligence of the United States Securities

13 and Exchange Commission ("SEC") and its agents and employees.

14                          **JURISDICTION AND VENUE**

15 18.        This action arises under the Federal Tort Claims Act, 28 U.S.C.

16 §§ 2671, *et seq.* ("FTCA").

17 19.        On January 27, 2009, Richard H. Gordon submitted an

18 Administrative Claim for the FTCA claim set forth below to the SEC.

19 20.        On February 10, 2009, Dichter-Mad Family Partners, LLP, Philip

20 Dichter and Claudia Gvirtzman Dichter submitted Administrative Claims for

21 the FTCA claims set forth below to the SEC.

22 21.        By letter dated July 24, 2009, the SEC denied Mr. Gordon's claim.

23 All conditions precedent to his FTCA action have been met.

24 22.        By letters dated August 7, 2009, the SEC denied Dichter-Mad

25 Family Partners, LLP's, Philip Dichter's and Claudia Gvirtzman Dichter's

26 claims. All conditions precedent to their FTCA actions have been met.

27 23.        This court has jurisdiction under, and by virtue of, 28 U.S.C. §§

28 1331 and 1346 (b).

   24.        Venue is founded in this judicial district based on 28 U.S.C. §§

1391 (e) (2) and 1402 (b), as a substantial part of the acts or omissions complained of occurred in this district, and on 28 U.S.C. §§ 1391 (e)(3) and 1402 (b) as the named individual plaintiffs reside in this district.

**FACTUAL ALLEGATIONS**

**A.   Background - Bernard Madoff's "Business"**

25.      In 1960 Bernard Madoff founded Bernard L. Madoff Investment Securities LLC, a brokerage firm, through which he rapidly accumulated thousands of clients. In 1990, 1991, and 1993, Madoff served as the Chairman of the NASDAQ Stock Market, and the trust and authority he had developed in that position enabled him to attract a wide array of investors to his firm in subsequent years. These investors included individuals, charities, universities, and pension funds, who often entrusted their entire life savings or endowments to Madoff.

26.      Investors received account statements showing consistent gains, and redemptions were paid to investors without delay.

27.      Some lucky investors chose to liquidate their accounts after accumulating what appeared to be a substantial profit. But many chose to maintain, or even increase, their investments, given the prospect of continuing gains-a prospect that also enticed innumerable additional investors to entrust their money to Madoff. New victims, enticed by stories of Madoff's success, were induced to invest in the scheme, thereby allowing Madoff to keep it afloat by using the new victims' money to pay redemptions by the old investors.

28.      Madoff operated his business in a highly secretive and centralized fashion, shrouded from public scrutiny. In fact, Madoff operated the investment advisory component of the business (which was allegedly the profit-making center of the operation) from a separate floor of the firm's offices in Manhattan's Lipstick Building located at 885 Third Avenue, with access restricted to Madoff and a small handful of his most trusted

confederates. Only Madoff had access to the books and records supposedly
accounting for those assets and for the billions of dollars in trades he
claimed to be executing.

**B.   June 1992 - Avellino & Bienes and the SEC's First Missed Opportunity**

   **1.   Background & Red Flags**

29.      In June 1992, customers of a firm known as Avellino & Bienes
provided the SEC with promotional materials created by Avellino & Bienes
that touted "100%" safe investments that would return consistently high
rates of return over significant periods of time. The opportunity to invest
with Avellino & Bienes was portrayed as "special" and exclusive, and the
firm claimed that VIP clients would earn even higher returns.[7] (Report pp.
41-42)

30.      The Enforcement team of the SEC's New York office opened an
investigation, and the red flags that had prompted the investigation soon
multiplied. The team quickly learned that Madoff had complete control over
all of Avellino & Bienes' investments. He made all investment decisions with
no input from Avellino or Bienes, who merely funneled investor money to
Madoff. One of the firm's principals told the SEC that Madoff had not lost
money on a single trade executed for a firm customer since their exclusive
relationship began in 1962. The principal explained that Madoff was able to
achieve these results by using a strategy based on blue-chip stocks hedged
by options on the S&P index. (Report pp. 45-46)

   **2.   The SEC's Negligent Handling of its Investigation**

31.      The Enforcement team suspected, based on the red flags raised
before and during its initial investigation, that Avellino & Bienes was
operating a Ponzi scheme, but never considered the possibility that Madoff
was also running a Ponzi scheme. The team's investigation was tailored and

---

[7] The façade of an "exclusive club" is often used to enhance the allure of investing in a Ponzi scheme,
making investors feel "lucky" to have the opportunity to participate in an opportunity touted as being only
for the "elite."

carried out accordingly, resulting in the first of many missed opportunities to catch Madoff. (Report p. 46, n. 20; 49)

32.        The team the SEC assigned to investigate Avellino & Bienes was woefully inexperienced. Both examiners assigned to the case were only 2 years out of college, and had no expertise or understanding of how Ponzi schemes operated. (Report pp. 46-47) Moreover, the supervisor later admitted that the team may have been overawed by Madoff, stating that "it was fair to say that because of ... Madoff's reputation at that time ... there may not have been any thought to look into [his] operation any further." (Report p. 50)

33.        The team conducted a very limited examination, failing to take rudimentary steps that would have demonstrated that Avellino & Bienes was merely one of many fronts for Madoff's Ponzi scheme.

34.        For example, the team made no effort to obtain bank records or otherwise trace the source of the money that was used to repay Avellino & Bienes' investors. This was critical because if Avellino & Bienes were operating a Ponzi scheme as suspected, it should not have had access to cash to payoff investors. The team's supervisor later told OIG that the team "should have been aware" of this fact, and one of the staffers testified that it would have been "common sense" to trace the money. (Report p. 49)

35.        Critically, the team did not make any effort to obtain any other information independently from third parties, which an SEC branch chief would later tell OIG was "the only way to verify" whether a Ponzi scheme is being conducted. (Report p. 290, n. 202)   Although the team did review records from the Depository Trust Corporation ("DTC"), [8] they obtained those DTC records from Madoff, not directly from DTC, and the Madoff-supplied

---

[8]  The DTC is the entity which holds actual paper stock certificates on behalf of their true owners, and maintains and operates the records and mechanisms for buyers and sellers to transfer ownership without having to take custody of or actually exchange the physical certificates. DTC's records can easily be used to verify claims of ownership of securities.

records were later determined to have been falsified.

36.     Moreover, with respect to document requests to Madoff, "[n]one of the [team members] interviewed by the OIG recalled whether the SEC eventually received the information and documents concerning Bernard Madoff that it requested in discovery." (Report p. 58) And the documents the team did receive only threw up more red flags. For example, the team's auditors were unable to confirm Madoff's trading activity using his customer statements, which the auditors found indecipherable.

37.     A senior-level SEC examiner later told OIG, "clearly if someone ... has a Ponzi [scheme] and, they're stealing money, they're not going to hesitate to lie or create records." (Report p. 49) The lead staffer on the team later admitted to the OIG that the team "should have been aware that the money used to pay back Avellino & Bienes' customers could have come from Madoff," and that independent confirmation of the source from DTC was essential. (Report p. 49) The supervisor stated that the DTC confirmation was "missed and should have been followed up on." Another team member characterized the failure to look into the actual source of the funds as a failure to observe "common sense." (Report p. 60)

38.     Separately, while the lead staffer believed that the entire Avellino & Beines operation raised red flags and was "suspicious," the team took no actions to investigate Madoff's alleged investment strategy, which was the sole vehicle for Avellino & Bienes' investments. They never attempted to determine whether the strategy could actually achieve the returns Madoff claimed, or to substantiate the extraordinary claim that he had never suffered a trading loss in three decades. (Report p. 60)

## 3.   Closing of the Investigation & Conclusions

39.     Instead of taking the simple steps required by SEC policy and common- sense practice, the SEC took the easy way out. It brought an action against Avellino & Bienes for selling unregistered securities, and required

it to refund all of its customers' money. Again, however, the team made no effort to determine where Avellino & Beines was getting the funds to payout a full redemption to all of its customers, reflecting a basic lack of understanding of Ponzi schemes. In fact, the money was coming from Madoff, who could only have been relieved to evade discovery of his entire scheme by paying redemptions to a single fund's customers.

40.     The SEC's negligence in the Avellino & Beines investigation included, without limitation:

- Assignment of a Ponzi-scheme investigation to SEC staff who had no experience with Ponzi schemes;

- Failure by the staff who received the initial complaint to tell the investigating staff that a Ponzi scheme was suspected;

- Failure to obtain DTC statements from DTC itself, instead of requesting them from Madoff;

- Failure to inquire as to the source of the money used to pay back Avellino & Beines customers; and

- Failure to inquire further when Avellino & Bienes were unable to produce any detailed financial statement or records.

As the OIG's Report concluded:

The result [of the SEC's investigation of Avellio & Bienes] was a missed opportunity to uncover Madoff's Ponzi scheme 16 years before Madoff confessed. The SEC had sufficient information to inquire further and investigate Madoff for a Ponzi scheme back in 1992. There was evidence of incredibly consistent returns over a significant period of time without any losses, purportedly achieved by Madoff using a basic trading strategy of buying Fortune 500 stocks and hedging against the S&P index. Yet, the SEC seemed satisfied with closing Avellino & Bienes down, and never even considered investigating Madoff, despite knowing that Avellino & Bienes invested all of their clients' money exclusively with Madoff. The SEC's lead examiner said Madoff's reputation as a broker-dealer may have influenced the inexperienced team not to inquire into Madoff's operations.

(Report, pp. 26-27)

C.   **May 2000 - Harry Markopolos's First Attempt**

42.      In May 2000, eight years after the SEC's first chance to stop Madoff slipped away during the Avellino & Bienes investigation, an industry analyst and Certified Fraud Examiner named Harry Markopolos gave the SEC's Boston office an eight-page complaint questioning the legitimacy of Madoff's reported returns, and provided substantial evidence and analysis to support his complaint. (Report p. 61)

43.      Markopolos set forth two possibilities for Madoff's performance: (a) that "[t]he returns are real, but they are coming from some process other than the one being advertised, in which case an investigation is in order;" or (b) "[t]he entire fund is nothing more than a Ponzi Scheme." Markopolos contended that Madoff's returns were unachievable using the "split-strike conversion" strategy and pointed out that Madoff's "perfect market-timing ability" was not a realistic explanation. Markopolos also pointed out that Madoff did not allow outside performance audits, further indicating a real risk of fraud. (Report p. 61)

44.      Markopolos subsequently attended a meeting at the SEC's Boston office in which he explained his analysis and encouraged the SEC to investigate Madoff. However, it was clear to Markopolos and an SEC accountant in attendance that the top SEC staffer at the meeting had "zero comprehension" of what Markopolos was explaining. In fact, Markopolos characterized the staffer as "not having a basic understanding of finance." The Report would later conclude that the senior staffer's ignorance of the subject matter was the likely reason that Markopolos's 2000 warning was disregarded by the SEC. (Report p. 64)

45.      This same staffer later stated that he had forwarded the complaint to the New York office, which he claimed was the proper office to handle the complaint because of Madoff's location in New York. However, the OIG found no evidence that he had actually forwarded the complaint, and nobody in the New York office recalls receiving it. (Report pp. 64- 65)

46.       In summary, the SEC's negligence in its handling of Markopolos's 2000 complaint included, without limitation:

- Assigning an SEC staff member who "had zero comprehension of topics" Markopolos discussed with him, who was "very ill-trained, uninformed about industry practices, did not understand financial instruments ... [and who] [d]idn't even have a basic understanding of finance" to investigate Markopolos' complaint; and

- That staff member's failure to forward Markopolos' complaint to the SEC's New York office despite that staffer's claims that he did.

D.    **March 2001 - Markopolos Tries Again**

47.    In March 2001, ten months after filing his first complaint, Markopolos returned with a second complaint, with updated information and additional analysis aimed at simplifying the presentation to the SEC staffers. The new complaint included an analysis of Madoff's returns versus the S&P 500, showing that:

> [Madoff purportedly] [e]arned over 15½% a year for over seven years with extremely low standard deviation of 4.3% versus the S&P 500 which earned over 19½% but with 12.9% annual standard deviation over the same period. This program earned 80% of the market's return with only one third of the risk. Think about it! Is this really possible, or is it too good to be true? (*I have attached an excel spreadsheet comparing and contrasting Madoff's program to the S&P 500 index.*)

> Only 3 down months vs. the market's down 26 months during the same period, with a worst down month of only  -1.44% (April 1993) vs. the market's worst down month of -14.58% (August 1998) ....

> These numbers really are too good to be true. And every time I've thought a company's or a manager's numbers were "too good to be true," there has been fraud involved.

> Yes, access to order flow is worth something but this worth can be measured in pennies per share ....

> Yes, Madoff can make more intelligent short-term bets via their access to order flow. However, short-term forecastability does not lead to long-term knowledge of where the stocks that he buys are headed. Short-term he may know there are a lot of IBM shares to buy, but that doesn't lead to knowledge of where IBM will be trading next month.

> Madoff's out-of-the-money OEX index puts do offer protection

against systemic market declines. However, his 30-35 stock portfolio has individual company risk in it and should experience more frequent and more sizeable losses than what his performance record indicates.

(Report pp. 67-68)

48.     Markopolos concluded that Madoff's "numbers really are too good to be true." Markopolos's analysis was supported by the experience of two of his colleagues, Neil Chelo and Frank Casey, both of whom had substantial experience and knowledge of investment funds, and both of whom offered their corroboration to the SEC. (Report pp 68-70)[9]

49.     This time, the SEC's Boston office did refer Markopolos's second complaint to New York, but the New York office decided, after just one day, not to investigate the complaint. The senior Enforcement attorney in New York who received Markopolos's second complaint rejected it out of hand, sending an email stating, "I don't think we should pursue this matter further." Later, the Enforcement attorney told the OIG that she "would have needed to consult" someone more experienced to actually understand Markopolos's complaint, but did not do so. (Report p. 73) The OIG "could find no explanation for why Markopolos's complaint, which the Enforcement attorney ... acknowledged was 'more detailed than the average complaint,' was disregarded so quickly." (Report p. 27)

50.     In summary, the SEC's negligence in its handling of Markopolos's 2001 complaint included, without limitation:

- Assigning the review of the complaint to an SEC staff member who had never handled a Ponzi-scheme investigation and had no understanding of options trading, an integral part of Madoff's purported strategy;

- That staff member's failure to consult with a staffer with more options expertise, as she herself conceded that she "would have needed" to do in order to perform a proper investigation; and

---

[9]   Chelo was a chartered financial analyst, chartered investment analyst, and a financial risk manager with substantial experience researching hedge funds. Casey was a registered investment adviser with an options specialization. (Report p. 68)

- Dismissal of the report in a single day, with no substantive review having been commenced.

E.    **May 2001 – News Articles Raise Suspicion that Madoff is a Fraud: The SEC Does Nothing**

51.    In May 2001, the respected industry publications *MARHedge* and *Barron's* both published articles questioning Madoff's operations and returns.

52.    The *MARHedge* article, written by Michael Ocrant and entitled "Madoff tops charts; skeptics ask how," stated how many were "baffled by the way [Madoff's] firm has obtained such consistent, nonvolatile returns month after month and year after year," describing the fact that Madoff "reported losses of no more than 55 basis points in just four of the past 139 consecutive months, while generating highly consistent gross returns of slightly more than 1.5% a month and net annual returns roughly in the range of 15.0%." (Report pp. 80-81)

53.    The *MARHedge* article further discussed how industry professionals:

> marvel at [Madoff's] seemingly astonishing ability to time the market and move to cash in the underlying securities before market conditions turn negative and the related ability to buy and sell the underlying stocks without noticeably affecting the market. **In** addition, experts ask why no one has been able to duplicate similar returns using [Madoff's] strategy.

(Report p. 81)

54.    The *Barron's* article, written by Erin Arvedlund and entitled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum," discussed how Madoff's operation was among the three largest hedge funds, and has "produced compound average annual returns of 15% for more than a decade" with the largest fund "never [having] had a down year." The *Barron's* article further questioned whether Madoff's trading strategy could achieve those remarkably consistent returns and asked why Madoff was not charging fees for his advisory business:

18

Curiously, he charges no fees for his money-management services. Nor does he take a cut of the 1.5% fees marketers like Fairfield Greenwich charge investors each year. Why not? "We're perfectly happy to just earn commissions on the trades," he says.

Perhaps so. But consider the sheer scope of the money Madoff would appear to be leaving on the table. A typical hedge fund charges 1 % of assets annually, plus 20% of profits. On a $6 billion fund generating 15% annual returns, that adds up to $240 million a year.

The lessons of Long-Term Capital Management's collapse are that investors need, or should want, transparency in their money manager's investment strategy. But Madoff's investors rave about his performance - even though they don't understand how he does it.

(Report pp. 75-76)

55.     The *Barron's* article was not merely information in the public domain that the SEC *should* have known about - there is clear evidence that the SEC *was* aware of the article at the time of its publication in May 2001. Indeed, on May 7, 2001, a senior staffer in the Boston office followed up with the New York office regarding the 2001 complaint from Markopolos that Boston had forwarded to New York. The staffer asked the top staffer on the New York Broker- Dealer team if he wanted a copy of the article, so that the New York team could follow up on the Markopolos complaint in light of the corroborating information in the article. The staffer declined, and OIG found no evidence that anyone in the New York office reviewed the article prior to 2005. (Report pp. 76-77)

56.     Separately, the top staffer in the Washington office's Investment Management team reviewed the *Barron's* article when it came out, and wrote a note at the top of the article that the author is "very good" and that "This is a great exam for us!" But the staffer did not send the article to anyone else in her office, or any other, and no investigation was ever opened. Nobody else in the Washington office recalled seeing the *Barron's* article

until years later.[10]   (Report p. 86)

57.        In summary, the SEC's negligence in its handling of the *MARHedge* and *Barron's* articles included, without limitation:

- Failure by the staffer who handled the 2001 Markopolos complaint to read the articles, despite the fact they were forwarded to her by another staffer with a note indicating their importance; and

- Failure to consider reopening inquiry into the 2001 Markopolos complaint despite the fact that the appearance of the articles at around the same time as the SEC's receipt of the second Markopolos complaint should have been considered as part of "the process utilized by [SEC] to determine if [the earlier] complaint was worth pursuing."

**F.  May 2003 – A Hedge fund manager files a Complaint Identifying "Indicia of a Ponzi Scheme"**

**1. Background & Red Flags**

58.        In May 2003, the SEC's Washington Investment Management team received a detailed complaint against Madoff from a reputable hedge fund manager based on information he had compiled in the course of performing due diligence on Madoff feeder funds. The complaint identified numerous red flags that he analyzed with the support of extensive documentation, including performance statistics for three Madoff feeder funds and the *MARHedge* article. (Report pp. 77-79)

59.        Specifically, the hedge fund manager pointed out the following red flags: (a) while Madoff purported to trade $8-10 billion in options, there was insufficient volume in the market to support a trading level even close to that amount;[11] (b) Madoff was waiving the significant management and performance fees typically charged by asset managers; (c) Madoff's purported returns were not duplicable by anyone else using his purported strategy; (d)

---

[10] Ironically, even though the SEC never followed up on the *Barrons* and *MARHedge* articles, Madoff himself had been fully expecting that it would do so. (Report p. 93, n. 62)

[11] The hedge fund manager and Markopolous both explained in their submissions to the SEC that even if there were enough options contracts to handle Madoff's claimed trading volume, the volume of his trades would have noticeably moved the market price for the options, which was not happening. As the Hedge fund manager stated, "(w)ith an 8-10 billion size, you must see the volume, but unfortunately you don't." (Report p. 79)

that there was no correlation to the overall trend in the equity markets;
(e) Madoff always knew just the right time to convert his accounts to cash;
and (f) the outside auditor of the firm was Madoff's brother-in-law. (Report
pp. 77-80)

60.     At that time in 2003, the SEC staffers assigned to reviewing the
complaint acknowledged that the complaint indicated that Madoff could be
lying about his activities, and that the red flags were indeed "indicia of a
Ponzi scheme." (Report p. 29)

## 2. **The SEC's Negligent Handling of its Investigation**

61.     Notwithstanding the obvious implications of the hedge fund
manager's complaint, the Washington office completely failed in its efforts
to investigate. First, the Investment Management team immediately referred
the complaint to the Broker-Dealer team, despite the fact that the latter
had no experience with Ponzi schemes or investment-management issues.
(Report pp. 82-84)

62.     The Broker-Dealer team never conferred with the Investment
Management team for support or information concerning the hedge fund
manager's complaint. OIG later determined that this was largely due to a
pervasive atmosphere of jealousy and secrecy that prevented SEC teams from
working together effectively. (Report pp. 91-92)

63.     This lack of communication with the experienced Investment
Management team was a significant problem because as the OIG found:

> It does not appear that the Branch Chief and examiners were
> chosen to work on the Madoff examination due to any particular
> expertise or experience. At the time of the Madoff examination,
> OCIE "didn't have many experienced people at all ... we were
> expanding rapidly and had a lot of inexperienced people at the
> time ...1 guess you could say we were all effectively
> inexperienced," [one staffer testified].

(Report p. 90)

64.     Another staffer stated that "there was no training," that "this
was a trial by fire kind of job" and there were a lot of examiners who

"weren't familiar with securities laws." The team was composed entirely of attorneys, who according to one member, did "not have much experience in equity and options trading" but "rather, their experience was in general litigation." Madoff later stated that one of the staff members "did not know what she was talking about, and that it was obvious she was not familiar with the industry." (Report p. 93, n. 62) And the second-most-senior staffer on the team later told OIG that he "didn't know anything, very little anyway, about hedge funds and mutual funds and how they operated." (Report p. 95)

65.     The inexperienced Broker-Dealer team did not begin its examination until December 2003, seven months after receipt of the hedge fund manager's complaint. During that time, millions of dollars continued to be stolen. The Broker-Dealer team could not explain to OIG why it waited so long. (Report p. 89)

66.     When the Broker-Dealer team did begin its investigation, it did so on entirely the wrong foot. The supervising staffers generally did not understand the complaint, and did not understand how it should investigate whether Madoff was running a Ponzi scheme or any of the many red flags that pointed in that direction. Instead, those supervisors chose to focus the investigation on front-running, which is the illegal practice of a broker executing orders on a security for its own account while taking advantage of advance knowledge of pending orders from its customers. For example, a broker will preemptively buy stocks for which it has a large buy order from a customer, knowing that the customer's order will drive up the price, allowing the broker to then sell its own stock at an immediate profit.

67.     In explaining the choice to focus the Broker-Dealer team on front-running, the supervisor stated that he did so "because that was the area of expertise for my crew." In other words, the team had only hammers, so it would look for only nails. The OIG's investigative team later "opined

that the decision to focus an exam based on the expertise of a team rather than on the complaint itself is nonsensical." (Report p. 94, n. 63)[12]

68.      The Broker-Dealer team's Planning Memorandum shows that the real issues of a potential Ponzi scheme and the numerous red flags in the complaint were ignored by the team. The Planning Memorandum omitted planning for numerous pertinent issues including: (a) Madoff's unusual fee structure; (b) the lack of sufficient options volume in the marketplace to support Madoff's claimed trading activity; (c) Madoff's inexplicable returns; (d) that Madoff's trading strategy was not duplicable; ( e) the disconnect between his returns and the market trends; (f) the extraordinarily well-timed cashing-out of accounts at the end of selected quarters; and (g) the family relationship between Madoff and his auditor. A staffer later testified that, while these areas were "something we would look at," he could not explain why they were not included in the team's review. (Report p. 96)

69.      The staff did include one avenue of investigation in the Planning Memorandum that was directly on-point with the complaint, but failed to execute that plan. Specifically, the team wrote that it planned to write a letter to the NASD to confirm Madoff's trading activity.[13] And the team did, in fact, draft the letter. But the team never sent it. Had the team followed through and sent the letter, it should have exposed Madoff's lack of trading

---

[12] The OIG's investigative team further concluded that:

> the scope of an examination may not, and at times should not, remain static. Newly discovered relevant information may necessitate a modification to the original scope of an examination. For instance, in addition to the investment adviser registration issue discovered during the examination, several other issues that were raised in the Tip (i.e. the hedge fund manager's complaint] and reiterated in a subsequent call with OCIE should have been but were not included in the scope of the cause examination. Such issues included the unusual fee structure; doubts expressed about replicating Madoff's strategy; concerns with regard to the lack of transparency in the options volume; and questions as to how Madoff was able to achieve his returns. (Report p. 106, n.70]

[13] NASD, or National Association of Securities Dealers, Inc., was the predecessor to the Financial Industry Regulatory Authority ("FINRA"), which regulates the activities of member firms in the financial-services industry, including BMIS prior to its collapse.

activity and brought down the scheme.

70.     Astoundingly, during the OIG investigation, one of the supervising staff explained that the letter was not sent because it would have been too burdensome and time- consuming for the staff to review the documents that the NASD would have supplied in response. Thus, a multi-billion-dollar Ponzi scheme continued to remain operational because the SEC, out of neglect, inattentiveness, and laziness, did not send a letter to the NASD that its own planning memo said should be sent, or otherwise contact any other independent third party. The OIG later stated that "[c]ourses of action in the Planning Memorandum that involved going to third parties should have been followed through upon, but were not," (Report p. 142), despite the fact that they "would have assisted in independently verifying trading activity conducted at Madoff." (Report p. 111, n. 74)

71.     During the course of the investigation, the Broker-Dealer team determined that Madoff was constantly lying to them. He lied about managing hedge funds. He lied about his overseas accounts. He lied about the reasons that his customer statements were so vague about trading details. He even lied about not having email, despite the SEC's knowledge that Madoff was claiming to run a highly sophisticated operation using "cutting edge technology." (Report p. 113)

72.     Again and again, junior SEC staffers complained to their supervisors that Madoff was totally dishonest, yet the team kept going back to him for more information, and continued to accept oral representations from him about his activities, and continued to accept those oral representations without seeking any third-party corroboration. As the OIG later concluded, this was in violation of standard SEC policies and practices, because "[r]elying solely on verbal answers from the subject of a cause examination is not an appropriate method of investigation." (Report p. 206, n. 143)

73.     For example, even though the hedge fund manager's complaint identified Madoff's relationship with his auditor as a red flag, the team never pursued that avenue of investigation at all. A staffer later testified that the auditor issue was "noteworthy and something that should have been followed up on." (Report p. 95)

74.     Likewise, the team failed to consult the Chicago Board Options Exchange ("CBOE"), despite the fact that the hedge fund manager's complaint questioned whether any of the options trades Madoff was purportedly making through that exchange, which were central to Madoff's claimed trading strategy, had actually taken place. (Report p. 96)

75.     Indeed, the Broker-Dealer team never requested a single bit of information or scrap of paper from any third party, a basic and fundamental procedure, notwithstanding the conclusive evidence of fraud anyone of those third parties could have provided.

76.     Even when the team could have pinned Madoff down by requesting critical documents directly from him, they failed even to carry out their own plans to do so. Specifically, the team drafted a document request to Madoff seeking detailed audit trail data, including the date, time, and execution price for all of his trades in 2003.[14] This request was critical because, unlike his fake computer-generated customer statements, the audit trail data would have been nearly impossible for Madoff to fabricate.

77.     But the team removed the request for this critical audit trail data from their request, later stating that the data would have been "tremendously voluminous and difficult to deal with" and would have "take[n] a ton of time" to review - again disregarding a simple common-sense procedure just to avoid doing the required footwork, i.e., its job. (Report p. 98) The team's supervisor later admitted to the OIG that it "would have

---

[14]  Audit-trail data is the information that documents and details every step of a securities transaction from order through execution.

1  been, frankly, asinine for us not to get the audit trail." (Report p. 109)

2  **3.   Closing of the Investigation & Conclusions**

3  78.      In early April 2004, having resolved none of the concerns raised

4  by the hedge fund manager's complaint, the team was suddenly told to shelve

5  the effort. Supervisors determined that a new investigation probing mutual

6  funds was more important than following up on Madoff, whom they already knew

7  was accused of operating what was later discovered to be the largest Ponzi

8  scheme in history. The investigation was never formally concluded, and no

9  final report or memorandum was produced, which the OIG determined was a

10 "critical error" and a serious failure to follow appropriate protocols.

11 (Report p. 144)[15]

12 79.      The OIG later stated that "significant questions or concerns

13 raised during a cause examination should not be left unresolved due to the

14 urgency associated with such cause examinations" (Report p. 13), and that

15 had this investigation "been staffed and conducted appropriately and basic

16 steps taken to obtain third-party verifications, Madoff's Ponzi scheme

17 should and would have been uncovered." (Report p. 29)

18 80.      In summary, the SEC's negligence in its handling of the hedge

19 fund manager's complaint included, without limitation:

20 
21 - Transfer of the complaint from the Investment Management team to
     the Broker-Dealer team in the SEC's Washington, D.C. office, when
     the former had relevant experience, and the latter did not;

22
23 - Failure of the Broker-Dealer team to open its investigation until
     seven months after receipt of the complaint;

24 - Failure of the Broker-Dealer team to enter its case-opening
     report into the SEC's STARS case-management system;

25
26 - Failure of the Broker-Dealer team to confer with and seek the
     Investment Management team's assistance even when the Broker-
     Dealer team knew its investigation was being hampered by its own
27   lack of understanding of the basic issues involved in the
     inquiry;

28

---

[15] The supervisor on the case stated that "staff is supposed to -- when they finish an exam they're supposed to close it out and I think there should have been a close-out memo is my understanding." (Report p. 136)

- Failure to tailor the team's Planning Memorandum to the Ponzi-scheme issues at the center of the complaint, and instead directing the inquiry towards front-running issues, because that was what the team was experienced in;

- Failure to send the letter to the NASD seeking trading information as called for by the team's own Planning Memorandum, purportedly because it would have been too burdensome to review the expected NASD response;

- Failure to obtain trading or other information from any other third parties;

- Continuing reliance on Madoff's own testimony and documents despite the fact that the team concluded that Madoff was lying to them;

- Team supervisor's prohibition against junior staffers contacting Madoff's counterparties due to irrational fear of personal liability;

- Failure to obtain detailed audit trail data from Madoff or elsewhere, which the team had specifically planned to ask for, and then inexplicably did not;

- Relying on Madoff's oral representations instead of demanding written statements; and

- Closing the investigation without reaching any conclusions or resolving any outstanding issues raised by the complaint or producing a case-closing memorandum.

81.    In concluding its analysis of the 2003 Washington office inquiry, the OIG stated that:

> A compelling and credible complaint was provided with several significant red flags. However, the exam was not staffed appropriately, delayed in outset, focused too narrowly, conducted without obtaining critical independent data and undertaking basic steps needed to address obvious suspicions, not given adequate priority, closed with unresolved issues remaining, and conveyed to NERO without full information. Because of these mistakes, an opportunity to uncover Madoff's Ponzi scheme was missed.

> (Report p. 145)

**G.   April 2004 – The Blind Following the Blind: SEC's New York Office Opens a New Madoff Investigation Unaware of the Washington Investigation**

### 1. Background & Red Flags

82.    In April 2004, just as the Washington office was idling the

investigation into the hedge fund manager's complaint, an Investment Management staffer in the SEC's New York office was conducting an examination of Rampart Investment Management, a firm unrelated to Madoff, and discovered internal Rampart emails that raised questions about whether Madoff was involved in illegal activity.

83.     These internal emails described the the red flags Rampart discovered while performing due diligence on its Madoff investment.[16] The red flags identified in the emails included "Madoff's:    (1) incredible and highly unusual fills for equity trades; (2) misrepresentation of his options trading; (3) secrecy; (4) [related] auditor; (5) unusually consistent and non-volatile returns over several years; and (6) fee structure." The emails also highlighted Madoff's: (7) "extraordinary" ability to know when to convert his positions to cash to avoid market downturns, and; (8) the fact that no rational counterparties should ever want to take the other side of options trades, in which he purportedly always came out on the winning side. (Report pp. 31, 152-153)[17]

84.     One of the internal emails the staffer discovered provided a step-by-step analysis showing that Madoff had to be lying about his options trading, which was the core of his alleged strategy. Like the complaints by Markopolos and the hedge fund manager, and as questioned by the *Barron's* and *MARHedge* articles, the emails showed that the market had insufficient volume to support Madoff's claimed options transactions, especially because they would all have had to happen at the close of trading in order to match up with Madoff's reported execution prices. Further, the email explained that because the options trades were *always* profitable for Madoff, there was no

---

[16] Notably, the hedge fund had specifically relied on the SEC's prior inquiries into Madoff, and the lack of any regulatory action against him, in making their investment with Madoff. (Report p. 157)

[17] In the financial-services sector, counterparties are the brokers, investment banks, and other securities dealers that serve as the contracting party when completing "over the counter" securities transactions (which are not made through securities exchanges, but rather directly between the parties or through non-exchange intermediaries). In Madoff's case, the counterparties would have been the entities he was trading options with, if he had actually been making any trades.

incentive for a counterparty to take the other side of those trades, which would be guaranteed to generate losses for them. (Report pp. 148-149)

85.     The staffer who first reviewed the emails believed they showed that there was "some suspicion as to whether Madoff is trading at all." This staffer and his supervisor stated to OIG that it would have been proper for them to have followed up on the allegation in the emails about "whether Madoff was actually trading." (Report p. 160)

86.     Unfortunately, the seemingly knowledgeable and presumably more skilled Investment Management team decided not to follow up themselves. Instead, like the Investment Management team in Washington, the New York team referred the issue to their office's Broker- Dealer team. As in the earlier investigation, the Broker-Dealer team never consulted with the Investment Management team for guidance, insight or advice. And like the Broker-Dealer team in Washington, the New York team waited seven months after the case was first referred to it, until December 2004, before a team was even assembled. (Report pp. 162-165)

**2. The SEC's Negligent Handling of its Investigation**

87.     Three months after the team was assembled, or 10 months after the emails were discovered, the New York Broker-Dealer team finally began performing fundamental background research on Madoff. But unlike the Washington Broker-Dealer team, the New York team did not even draft a Planning Memorandum to guide their investigation, in violation of SEC policy and practice. (Report p. 166)

88.     Once again, although the Rampart emails, like the earlier hedge-fund manager complaint, raised suspicions about whether Madoff was engaging in any trading at all, the supervising staff member decided, in knee-jerk fashion, to focus the inquiry exclusively on front-running. Astoundingly, the supervisor stated that this was done because "portfolio analysis was not a strength of broker-dealer examiners" - the same purported justification

given by the Washington team for its own botched investigation. (Report p. 168)

89.      In other words, the team would look into a non-core issue simply because they acknowledged they were incompetent to investigate the core issues of a Ponzi scheme. As the OIG later concluded, "[i]n order to conduct an effective examination, the focus of the examination should be based on the allegations raised in the complaint rather than the expertise of a team." (Report p. 138)

90.      To the extent that the team went beyond the front-running issue, it limited itself to asking Madoff questions and accepting, at face value, the answers and documents he provided, even though the junior staffers on the team frequently concluded that the documents were opaque and that Madoff was lying.[18]

91.      For example, Madoff claimed that he was no longer trading options, but the team knew that this was inconsistent with every piece of information they had ever seen about Madoff's operations and strategy, and every statement he had ever made about that strategy. (Report p. 172)

92.      As to why Madoff did not collect fees like all other hedge fund managers, they accepted at face value his response that he was not "greedy" and was happy with just receiving brokerage commissions, despite the fact that this meant foregoing hundreds of millions of dollars in fees. (Report p. 173)

93.      Madoff heightened the staffers' suspicions about him even further by tightly controlling access to his firm and its employees,[19] and by trying

---

[18] One of the staffers described Madoff's customer statements as "clear as mud." (Report p. 211)

[19] "On one occasion, when a Madoff employee was speaking to the New York Broker-Dealer team at Madoff's firm, after a couple of minutes, another Madoff employee rushed in to escort her from the conversation, claiming she was urgently needed. When the staffers later asked Madoff the reason for the urgency, Madoff told them her lunch had just arrived, even though it was 3:00 o'clock in the afternoon." (Report p. 33)

1  to bully and/or impress them with implications of his wealth, power, and

2  connections.[20]

3  94.      Nevertheless, despite Madoff's improper behavior and his outright

4  deceptions, the staff never made any real attempt to verify the answers

5  Madoff provided against evidence from third-parties and, indeed, never even

6  bothered to inspect the 17th Floor office in the Lipstick Building that

7  Madoff claimed was the nerve center of his investment-advisory business.

8  (Report p. 183)

9  95.      For example, the allegation in the Rampart emails that Madoff's

10 auditor was his brother-in-law, an obvious red flag, was never examined at

11 all. Later, after Madoff confessed, a staff attorney in the New York office

12 was assigned to investigate Madoff's auditor, and within a few hours, he

13 determined that the auditor was running a one-man-operation out of a single

14 room in suburban New York, that the auditor could not have been capable of

15 auditing Madoff's operations, and that, in any case, no audit work had ever

16 been done. He concluded that had a few simple inquiries been made by SEC

17 staff, Madoff would have been exposed years earlier. (Report p. 174, n. 107)

18 96.      Moreover, the team never contacted any of Madoff's counterparties

19 to see if he was actually trading with them. One of the Rampart fund

20 managers who wrote the emails at the center of the investigation later told

21 the OIG that this was elementary, and within the capabilities of even a non-

22 regulator:

23       A:    ... *This is not rocket science.*

24       Q:    Do you think that someone from the SEC should be able to
             figure this out?

25

26       A:    *Much more elementary than that.* Someone at the SEC could
             wander down, you know, to Goldman Sachs and wander over to
             their options department and ask them, how does somebody

27

28 [20] One staffer told the OIG that "'[a]ll throughout the examination, Bernard Madoff would drop the names
   of high-up people in the SEC'" and that "Madoff told them that Christopher Cox was going to be the next
   Chairman of the SEC a few weeks prior to Cox being officially named. He also told them that Madoff
   himself 'was on the short list' to be the next Chairman of the SEC." (Report p. 180)

execute $10 billion of options, and find out it's very
difficult. This is not . . . proprietary Renaissance
analysis here. ... Paul Broder would not claim to be a
mathematician, and he's an expert of this, and he's very
smart. But you don't have to be as smart.

\*\*\*

*If your SEC person had a small amount of expertise,* it's
clear you go to Madoff and you say, show me the - show me
your volume. Show me the counter parties. And you see how
he's managing to do these extraordinary things. ... [Y]ou
don't have to figure out if he's front-running or if he's
doing something weird. You ask him to show you what he's
doing.

(Report p. 155, 157 (emphasis added))

97.    And even when the junior staffers became fed up with Madoff's lies,
and at least tried to contact third parties for independent verification of
Madoff's dubious claims about his activities, they were vetoed by the
supervisor. Despite the fact that the supervisor was admittedly "aware that
the [staff] ... felt they were lied to by Mr. Madoff on numerous occasions,"
he was hesitant to make trouble for someone so "well connected," and warned
the team to "keep its eyes on the ball," enforcing a tunnel-vision focus on
front-running. (Report p. 194) He relentlessly blocked the junior staffers'
attempts to follow up, "actively discouraging them from forcing the issue"
with Madoff. (Report p. 34)

98.    Indeed, the supervisor expressed a fear that he (and the junior
staffers) could be sued as individuals if their inquiries to third parties
somehow damaged Madoff's business. (Report p. 221) No competent regulator
would believe that an inquiry to a third-party would result in personal
liability, but even the team's supervisor was not that minimally competent.[21]

99.    In this, and other instances, the supervisors would demonstrate
that they had become "captive" regulators, who would turn a blind eye to the
suspicious activities of industry heavyweights like Madoff, who they

---

[21] Personal liability for negligent acts by federal employees committed within the scope of their duties was
abolished in 1988 by the Federal Employees Reform and Tort Compensation Act.

considered "powerful and well connected," rather than risk even the emptiest

threats to their careers. (Report p. 135)[22]

100.     Moreover, one of the junior staffers later told OIG that he did

not contact the third-party source of the emails that had sparked the

investigation due to his understanding from his supervisors that the SEC did

not contact third parties as a matter of policy and practice:

> My understanding is that we really, as an agency don't do that
> and I mean it wasn't my call. I didn't ask to, nor was I
> directed, but it's just an understanding that we sort of do our
> examinations and investigations without going to sort of third
> parties.

[Report p. 175] As is clear from the OIG Report and the later reflections

of the staffers on the Madoff investigations, contacting third parties is

an essential part of any such inquiries. But the fact that a junior staffer

would believe that the SEC does not contact third parties as a deliberate

policy speaks volumes as to the negligence of his supervisors and the

general   unfamiliarity   of   SEC's   junior   staffers   with   fundamental

investigative techniques.

101.     The New York team did reach out to one third party, and had the

team followed through on its effort, it would have discovered the Ponzi

scheme. One of the staffers sent a letter to a large and reputable foreign

financial institution Madoff claimed to be using to clear his trades. The

financial institution replied that there was no trading activity in Madoff's

account. That reply should have set off alarm bells. But, instead of

following up with other third parties to see if *anyone* was clearing trades

for Madoff, the staffer simply concluded that Madoff must have been clearing

his trades somewhere else, without even asking that question of any other

clearing firm. He later told the OIG that he did not pursue the matter

further because he did not believe he could have obtained audit trail data

---

[22] Indeed, one supervisor is quoted by the Report as having said during an unrelated investigation that detecting fraud is "not our job."

from foreign sources, which the OIG concluded was incorrect: the data could-and should-have been obtained from anyone of multiple other sources. (Report p. 231)

102.     When the team demanded documents and information directly from Madoff, he gave them a unwelcome surprise. Madoff stated that he had already provided the information to the Broker-Dealer team from the Washington office. This was news to the New York team, which never knew about the existence of the Washington investigation, and were dumbfounded and embarrassed in the presence of the target of their investigation.

103.     The New York team's ignorance of the Washington team's activities is not surprising given two facts. First, the Washington team had never entered the opening of their case in the SEC's internal case tracking system, which violated standard SEC policy. Second, even if the Washington team had followed that policy, the New York team never checked the system before launching its own investigation, another violation of standard SEC policy. As the OIG later concluded, "there should never be two examinations of the same entity being conducted at the same time without both teams being aware of each other's examination." (Report pp. 131-133)

104.     After Madoff alerted the New York team to the existence of the Washington investigation, there were a few cursory phone calls exchanged, but "relatively little sharing of information." The Washington team declined to reopen their dormant investigation, and instead passed their work papers to the New York team, which in turn disregarded them. (Report p. 34)

105.     The New York team never familiarized itself with the hedge fund manager's complaint, never discussed the Washington team's collection of unanswered questions, and never even compared the list of clients Madoff had given the Washington team with the one he had given them, which would have revealed glaring inconsistencies that could not have been explained by anything other than fraud. Instead, the responsible staff member stated that

he "may have glanced at" the hedge fund manager's complaint, and that:

> I had conducted some sort of like cursory review of the documents, but it seemed so similar to what we were receiving in real time, that I didn't spend a lot of focus and I just - this didn't stick out to me at the time.
> [Report p. 200]

106.     Indeed, if anything, this latest round of the SEC's passing the buck from team to team served only to help cut short the New York investigation. While junior staffers pushed to follow leads and pursue Madoff's deceptions, their supervisors determined that because the Washington office had looked into similar issues, they must have been properly resolved when in fact the Washington investigation had never concluded and left a mountain of unanswered questions. The supervisors claimed that those issues had already been resolved by Washington and could be disregarded. When the junior staffers persisted, the supervisors admonished them that the SEC could not be wasting resources on a "hunch." (Report p. 223)

   **3.     Closing of the Investigation & Conclusions**

107.     The suspicions about Madoff raised in the hedge fund manager's complaint and the Rampart emails were not based on hunches, but on solid evidence. Nevertheless, the New York office closed its investigation in September 2005, reporting that all of the red flags had been addressed - by information and documents provided by Madoff himself.

108.     In summary, the SEC's negligence in its investigation of the Rampart emails included, without limitation:

- Transfer of the complaint from the Investment Management team to the Broker-Dealer team, when the former had relevant experience, and the latter did not;

- Failure of the Broker-Dealer team to open its investigation until seven months after receipt of the complaint;

- Failure of the Broker-Dealer team to check the STARS system for related open investigations;

- Failure of the Broker-Dealer team to actually begin work until three months after it opened its investigation;

- Failure to draft a planning memorandum to direct the investigation;

- Failure to tailor the team's investigation to the Ponzi-scheme issues at the center of the complaint, and instead directing the inquiry towards front-running issues, because that was what the team was experienced in;

- Failure to inquire as to the relationship between Madoff and his auditor;

- Failure to take any action after discovering that a financial institution Madoff claimed to be clearing through was not, in fact, clearing any trades for him;

- Failure to contact any other third parties to obtain confirmation of Madoff's claimed activities;

- Reliance on Madoff's testimony and evidence despite the team's conviction that he was lying to them;

- Reliance on Madoff's oral representations instead of demanding written statements; and

- Supervisors' insistence on closing investigation when none of the outstanding issues had been addressed or resolved.

109.    The OIG concluded its analysis of the 2004 New York inquiry as follows:

> A compelling and credible complaint was provided with several significant red flags. However, the examination was not staffed appropriately, delayed in outset, focused in error, conducted without obtaining critical independent data, examiners were not allowed to follow up on their suspicions, and it concluded with unresolved issues remaining and with a closing report that relied too heavily on the representations of Madoff. Because of these mistakes, an opportunity to uncover Madoff's Ponzi scheme was missed.

> (Report p. 255)

**H.   October 2005 - Harry Markopolos Strikes Out**

**1. Background & Red Flags**

110.    By October 2005, Markopolos had assembled a mountain of evidence in anticipation of his third attempt to rouse the SEC to the danger posed by Madoff. He gave the SEC's Boston office another version of his

report, this time under the unambiguous title "The World's Largest Hedge Fund is a Fraud." (A copy of Markopolos's 2005 report is annexed hereto as Exhibit C.)

111.     The updated report provided overwhelming evidence that Madoff was operating a Ponzi scheme, identifying at least twenty-nine separate red flags, which, while similar to the ones previously raised in the hedge fund manager's complaint and the internal emails, provided even more detail as to Madoff's obsessive secrecy and the impossibility of his claimed returns and options trading volume. Specifically, Markopolos identified:

- The unusual commission arrangement noted in the *Barron's* article;

- Madoff's funding at such a high implied interest rate, when lower rates would have been available through the use of short-term securities-the only reason to do this would be to avoid disclosures required in short-term markets;

- Secrecy despite success;

- Listed number of call options available in the market not sufficient to provide returns claimed by Madoff;

- Listed number of put options available in the market not sufficient to provide returns claimed by Madoff;

- Returns too good to be true considering that some of Madoff's strategy still depended on consistently picking good stocks through market downturns;

- Counter-party risk too high for alleged trading partners to approve if he was really trading through them;

- Bid-ask spreads of option trading would preclude profit at volume Madoff was purportedly trading;

- Madoff would need to be generating far more paperwork, available through counterparties, than he was, given volume of trading;

- "Split-strike" strategy cannot produce such consistent deviation from market performance;

- The industry awareness of Mad off's suspicious activities evidenced by the *Barron's* and *MAR/Hedge* articles;

- Too few losing months for any broker to achieve honestly;

- Returns could only be real if Madoff was front running;

- Brokerage "subsidized" down months to avoid reporting losses;

- Madoff had "perfect" market timing ability;

- Madoff did not allow outside performance audits;

- Returns inconsistent with similar fund in existence as long as Madoff's;

- No option funds created since 2004 had comparable performance;

- Several high-ranking finance-company executives think Madoff is a fraud;

- Madoff claimed his strategy depended on a trading device invented in 1998, but had equal performance results in the prior years;

- Madoff's reported performance compared to S&P 500, even though he was using a strategy based on S&P 100;

- Madoff was borrowing money at 16%, yet allowing funds to keep up to 20% in fees;

- Only Madoff family members privy to details of alleged trading strategy;

- Madoff's position at NASDAQ meant he was unlikely to be investigated by them;

- Madoff uses brother-in-law as outside auditor;

- "Split-strike" strategy cannot earn claimed returns;

- Madoff's "Sharpe Ratio" (reward-to-variability ratio) was "UNBELIEVABLY HIGH"; and

- Madoff told domestic fund-of-fund managers that he had so much money under management he was refusing new investment, but was telling European fund-of fund managers that he was giving them "special access" and making exceptions for them.

(Exhibit C at pp. 3-13)

112.     Markopolos's analysis was based on a review of Madoff's reported performance over 174 months. Specifically, Markopolos found that Madoff had reported gains in 96%, or all but seven of those months. (Exhibit C p. 14)

113.     Markopolos used this example to explain to the SEC why his conclusions of illegality were not a matter of judgment, but a matter of

fact, saying:

> No major league baseball hitter bats .960, no NFL team has ever
> gone 96 wins and only 4 losses over a 100 game span, and you can
> bet everything you own that no money manager is up 96% of the
> months either.

(Exhibit C at p. 14)

114.    Markopolos told the SEC in his 2005 report that they could confirm his conclusions by speaking with a number of other industry professionals, including high-ranking equity derivatives professionals at Citigroup and Goldman Sachs, whose contact information and credentials he supplied. (Exhibit C at pp. 12-13)

115.    Finally, and as Markopolos stated in his report, the SEC could have observed Madoff's fraud in action simply by checking the options market tables in a newspaper. As a mathematical matter, if Madoff had been trading options at the gigantic scope he claimed, then those trades should have been moving the market. But they were not, because those trades never happened. (Exhibit C at pp. 6-7)

116.    Markopolos's report did discuss the alternative possibility already investigated and dismissed (twice) by the SEC-that Madoff was front-running. But Markopolos characterized that scenario as "unlikely." (Exhibit C at pp. 1-2,8-9)

117.    Unlike the staffers who had dismissed Markopolos in 2000 and 2001, the Boston staffers who received his 2005 report knew him as a credible industry analyst whose Ponzi-scheme allegations should be taken seriously. However, the Boston staff believed that the New York office was the logical office to follow up, and once again the hot potato was passed from team to team. Apparently aware of the inter-office politics that could interfere with such a referral, and in an attempt to convey "the potential urgency of the situation," the Boston staff repeatedly followed up in the days after it transmitted the report to New York. (Report p. 242) That

1  effort failed.

2  **2. The SEC's Negligent Handling of its Investigation**

3  118.        After the Markopolos report was referred by the Boston office to

4  the New York office, it was assigned to an Enforcement team, which should

5  have resulted in a more capable inquiry than the earlier Broker-Dealer

6  examination teams in Washington and New York. But the team that was

7  assembled, like the Broker-Dealer teams, had no useful experience in

8  conducting Ponzi scheme investigations. Indeed, the lion's share of the work

9  was assigned to a junior staff attorney who had only recently graduated from

10 law school and joined the SEC nineteen months before the referral. She had

11 no working knowledge at all of broker-dealer issues, or any other financial-

12 regulatory matter; a deficiency that, combined with the unprofessional

13 attitude of her supervisor, would repeatedly sabotage the team's

14 investigation. (Report pp. 242-244)

15 119.        When the Enforcement team was given the assignment, Markopolos

16 himself contacted the supervising staff member to ensure that the

17 information in his report was clear and was understood by the team.

18 Ironically, in doing so, he inadvertently triggered a vendetta against

19 himself by the supervisor, who would thereafter constantly denigrate him and

20 the importance of the investigation. (Report pp. 247-251)

21 120.        Specifically, Markopolos asked the supervisor if she had any

22 experience with investigations into derivatives trading.[23] The supervisor

23 replied that she did, referring to her experience with the Adelphia

24 scandal.[24] Markopolos was surprised because the Adelphia case did not involve

25 derivatives at all: rather, it was an accounting-fraud case. When he

26 [23] A derivative is a financial instrument that is *derived* from the future value of some other asset, index,
   event, value or condition. An option is a kind of derivative.

27

28 [24] Adelphia Communications Corp. was a cable-television company that imploded when it was discovered
   that the company's founders had manipulated a complex cash-management system and a network of shell
   companies to cloak their theft of $100 million in company funds. No financial products other than Adelphia
   stock were involved in the scandal.

explained this to the supervisor, she brusquely terminated the conversation, presumably embarrassed at having been exposed as not knowing about derivatives transactions. This lack of knowledge seriously handicapped any investigation of whether Madoff's complex options-trading strategy was cloaking a Ponzi scheme. (Report p. 251, n. 174)

121.    The supervisor thereafter refused to acknowledge Markopolos's expertise or the importance of his report and its conclusions. Instead, she manufactured reasons why the team should not take him seriously, such as that Markopolos was not a Madoff insider or client; a fact which had no bearing on the evidence laid out in his submission. Indeed, the supervisor even suggested that Markopolos was not credible because he was probably a "bounty hunter," despite the fact that Markopolos's own report demonstrated that, if he was right in his suspicions, he would not be eligible for any bounty. (Report p. 275. n. 192)

122.    The supervisor persisted in these characterizations even after staffers in the Boston office called her to vouch specifically for Markopolos's credibility. (Report p. 275. n. 193) She failed also to contact the industry professionals Madoff had referred to her to back up his report. And when Markopolos followed up, offering the supervisor a large stack of materials to further support his claims and to aid in the investigation, she admittedly disregarded the additional submission completely. (Report p. 275) The supervisor was angry, embarrassed, and unwilling to acknowledge her own lack of expertise, and she ended up taking out her personal frustrations on Markopolos and, in turn, on Madoff's victims.

123.    The Enforcement team's investigation was further undermined by its contact with the New York Broker-Dealer team, which falsely stated that it had already investigated the Ponzi-scheme angle, saying that "these are basically the same issues we investigated" and that Markopolos didn't "have the detailed understanding of Madoff's operations that we do which refutes

most of his allegations." (Report p. 276) Later, the Broker Dealer team admitted to OIG that none of this was true, and that it had only examined the frontrunning issue. Due in part to this negligent mischaracterization of the Broker-Dealer team's work, the Enforcement team proceeded as if merely retreading old ground.

124.     When it did begin its investigation, the Enforcement team waited two months, until December 2005, to open a matter under inquiry ("MUI"), a required step at the beginning of any Enforcement investigation. In the MUI, the team termed its inquiry a "fraud investigation" (Report pp. 262-263), and in the subsequent Case Opening Report filed by the team on January 24, 2006, the team stated that it was "trying to ascertain whether the complainant's allegation that BLM[S] is operating a Ponzi scheme has any factual basis." (A copy of the January 24,2006 Case Opening Report is annexed hereto as Exhibit D.)

125.     Prior to its delayed opening the MUI, the Enforcement staff was not automatically informed of other relevant information that the SEC received about Madoff. (Report pp. 262-265) In this instance, the delay was highly material, because the SEC had received yet another complaint about Madoff in October 2005, from an anonymous informant stating, "I know that Madoff [sic] company is very secretive about their operations and they refuse to disclose anything. If my suspicions are true, then they are running a highly sophisticated scheme on a massive scale. And they have been doing it for a long time." The informant also stated: "After a short period of time, I decided to withdraw all my money (over $5 million)." Because of the failure to open the MUI, the Enforcement staff was ignorant of this complaint for the duration of its investigation. (Report p. 284)

126.     Hobbled by inexperience, misplaced personal feelings, a lack of fundamental securities, financial, and investigative knowledge, incompetence, and laziness, the Enforcement staff focused its investigation

in all the wrong places. Just as the earlier investigations had focused on front-running instead of the Ponzi-scheme scenario, the Enforcement team focused almost exclusively on determining whether Madoff should register as an investment adviser or whether Madoff's hedge fund investors' disclosures were adequate. This focus clearly ignored the initial designation in the MUI of a "fraud investigation." Moreover, the OIG determined that the Enforcement team's plan "primarily involved comparing documents and information that Madoff had provided to the [Broker-Dealer team during its prior investigation] (which he fabricated) with documents that Madoff had sent his investors (which he also fabricated)." (Report p. 269)

127.     Nevertheless, even with all the handicaps the investigation was suffering under, the Enforcement team still caught Madoff in a pattern of relentless lies, reminiscent of the earlier experience of the Broker-Dealer teams. For example, documents the Enforcement team obtained from a Madoff feeder fund demonstrated that Madoff had previously lied to the Broker Dealer team about having stopped using options as part of his strategy. Indeed, when the team interviewed one of the feeder fund's executives, they discovered that his statements on the issue were scripted by Madoff himself. (Report p. 37) Yet, the Enforcement team never followed up on this obvious deception about the very nature of Madoff's entire "proprietary" trading strategy, or the fact that he was manipulating and controlling the fund managers who were steering clients to him to the extent that they would parrot his lies to the country's top securities-law enforcement agency.

128.     In February 2006, the Enforcement staff, which had no idea how to investigate Madoff's purported trading strategy, and had been spinning its wheels for months, finally reached out for assistance by contacting the SEC's Office of Economic Analysis ("OEA"). But OEA failed to respond to the request in any way. **In** April 2006, the Enforcement staff returned to OEA, but this time, it failed to provide OEA with a copy of Markopolos' 2005

1  complaint. (Report pp. 295-301)

2  129.      One OEA staffer, who was an expert in options trading, later

3  reviewed some other materials describing Madoff's strategy and concluded

4  after 20 minutes, that Madoff's "split-strike conversion" strategy "was not

5  a strategy that would be expected to earn significant returns in excess of

6  the market." The OEA staffer later stated that, if he had known the massive

7  amount of assets Madoff claimed to have under management, he would have also

8  mathematically ruled out front-running. Incredibly, though, this expert, who

9  had the evidence of Madoff's fraud in his *hand-and understood it, unlike the*

10  *Broker-Dealer team-never* communicated his conclusions to the Enforcement

11  team. The Enforcement team never followed up. (Report p. 299)

12  130.      The Enforcement team never contacted any of the other SEC offices

13  with relevant experience, despite the fact that it had no comprehension of

14  the most basic concepts required to carry out their investigation. For

15  example, the team was not aware of how trading activity could be confirmed,

16  how custody of assets could be determined, and how trading volume observed

17  in the market could indicate whether or not the massive movement represented

18  by Madoff's alleged activities was actually occurring.

19  131.      Specifically, the team never contacted the SEC's Division of

20  Trading and Markets, which could have explained how trading could be

21  confirmed through DTC or NASD. Nor did it contact the SEC's Office of

22  International Affairs to gain an understanding of Madoff's alleged trades

23  with foreign counterparties, a tool he utilized to fool the investigators

24  into thinking he was actually doing business. (Report pp. 306, 335) In part,

25  this was because the team's supervisor did not think much of OIA, stating in

26  a contemporaneous email: "I hate OIA - they are probably the slowest part of

27  our bureaucracy, and that is saying a lot." (Report p. 335)

28  132.      In May 2006, notwithstanding this complete lack of substantive

competence, and despite an explicit warning from a senior NASD officer that

it was not properly equipped to do so, the Enforcement team went ahead with a sworn examination of Madoff.[25]

133.      Madoff appeared for the examination on May 19, 2006 *without counsel,* continuing a pattern he had established throughout the SEC's inquiries of handling all interactions with the SEC personally. (Report p. 310) This alone should have set off alarm bells for the staff, given the fact that it is unheard of for a major financial firm like Madoff's to conduct any, let alone all, of its contact with a regulatory agency through anyone but attorneys or compliance officers, let alone the firm's chief executive officer.

134.      Instead of viewing Madoff's solo appearance as evidence of illegal activity, the staff simply thought that it "seemed funny." More importantly for them, they viewed it as burdensome because Madoff was more difficult to deal with than an attorney would have been. In other words, the team's concern with small matters of convenience again obscured its view of the "big picture" warning sign presented by Madoff's appearance without counsel. As one witness would later explain to the OIG, the SEC staffers consistently "missed the forest for the trees." (Report p. 423)

135.      During the examination, Madoff "provided evasive answers to important questions, provided some answers that contradicted his previous representations, and provided some information that could have been used to discover that he was operating a Ponzi scheme." (Report p. 310) For example, when asked the critical question of how he was able to achieve his consistently high returns, Madoff employed the philosophy that the best defense is a good offense. He disregarded the substance of the question, and instead attacked the author of the *Barron's* article. He then repeatedly

---

[25] The NASD officer later testified that the Enforcement team had asked him "extremely basic questions" about options trading that indicated the team's total lack of capacity to investigate Madoff. Referring to a conversation he had with another NASD officer, "we were both, sort of, shaking our heads, saying that, you know, it really seemed like some of these (options trading] strategies were over their heads." (Report p. 310)

45

distracted the neophyte team from the nuts and bolts of his purported trading strategy by attributing his success to his "gut feel" for the market. Of course, a more experienced team of staffers, or even marginally more knowledgeable lay persons, would have known that three decades of unbroken double-digit returns cannot be achieved through supernatural instincts. The Enforcement team, however, accepted Madoff's explanation at face value. (Report pp. 310-320)

136.    Notwithstanding its wholesale mishandling of the examination, however, the team again came close to uncovering Madoff's fraud as a result of his sworn testimony, but again failed to follow-up. Madoff testified that the trades for all of his advisory accounts were cleared through his account at DTC, and the account was segregated at DTC from his brokerage accounts. Given his prior experience with SEC investigations, Madoff was surprised when the staffer asked for the DTC account number. Boxed in, Madoff reluctantly complied. (Report pp. 323-334)

137.    Madoff later told OIG that, at the time, he thought that his scheme was about to be exposed: "I thought it was the end game, over. Monday morning they'll call DTC and this will be over." (Report p. 312) A single call to DTC would have revealed that regardless of whether his DTC accounts were segregated, he was not holding the billions of dollars in stock positions he claimed to have.

138.    Subsequently, the junior staffer on the Enforcement team actually did contact DTC. She asked whether Madoff had two segregated accounts as he had testified. DTC confirmed that there was only a single, unsegregated account, but the staffer "ascribed no significance" to Madoff's lie. (Report p. 330) And due to her inexperience and lack of understanding of basic trading concepts, the staffer never asked the next obvious and critical question, which could have ended decades of fraud: "How much is in the account?" If she had, she would have discovered a much more troubling

lie: while Madoff had represented that the account contained at least $2.5 billion in S&P equities, it actually contained less than $18 million of those equities. As Madoff himself expected, that information would have brought down his house of cards. Instead, as he said, "it never happened." He "was astonished." (Report p. 312)

139.    Furthermore, even with the limited information she had obtained from DTC, the junior staffer had all the evidence she needed to pursue Madoff for commingling the funds of his advisory and market-making businesses - DTC had explicitly told her that Madoff did not maintain segregated accounts. But the staffer apparently was too inexperienced to understand that she had already caught Madoff in serious wrongdoing, and simply disregarded the commingling, which, if pursued, would itself have inevitably brought down the scheme. (Report p. 332)

140.    The Enforcement team also missed other opportunities to catch Madoff by obtaining basic information from third parties and then utterly failing to follow up obvious and necessary areas of further inquiry. For example, the team contacted the NASD to ask about Madoff's claim to have held certain option positions on a particular date. The NASD replied that in fact Madoff had no option positions on that date. Not understanding the monumental significance of this fact, the Enforcement team did not follow up, despite the fact that Madoff's entire trading strategy allegedly hinged on the actual existence of those positions. (Report pp. 306-309) No competent securities regulator could fail to recognize that a purported options trader who does not in fact trade options perforce is a fraud.

141.    Likewise, although the junior staffer attempted to obtain documentation from Madoff's purported counterparties, and one of them was in the process of drafting a consent letter asking Madoff's permission to send the Enforcement team documents that would have exposed the scheme, the staffer's supervisor instructed her to rescind the request, a decision the

OIG would later describe as "inexplicable." (Report pp. 370-371)

142.     But the team's supervisor did *try* to explain, telling OIG that she believed that the team would need a formal order and subpoena from the SEC Commissioners to pursue information from the foreign counterparty. As OIG later explained, this was simply not the case. (Report pp. 337-340)

143.     The junior staffer later acknowledged that the team had not confirmed Madoff's purported trading activity, and essentially laid the blame on her supervisors, who had failed to provide her with proper information or support:

> I knew what we did and what we didn't do, so I knew that we ultimately did not get the confirmations with - from the counterparties. I relied on the judgment of my supervisors that we were done.

(Report p. 357)

### 3. Closing of the Investigation & Conclusions

144.     The cumulative effect of the junior staffer's inexperience and incompetence, and her supervisors' hostility towards Markopolos, was that the 2005 Enforcement team's investigation discovered nothing but a red herring. Having established that Madoff lied about the number of investment-advisory clients he had, the team merely procured his agreement to register as an investment adviser. This, despite the fact that the team's own case-opening report indicated that the purpose of the investigation was to determine whether Madoff was a fraud.[26]

145.     Apart from the registration, no action was taken, not even a rudimentary follow-up with respect to the services Madoff was supposedly performing for the investment-advisory clients he had lied about not having. Had such a follow-up been conducted, the team could have discovered the

---

[26] As one former SEC examiner told the OIG, "[t]he analogy that we use is that a typical SEC examiner walks into a room where there are a bunch of dead bodies lying around and they notice that the clocks are 10 minutes fast." (Report p. 176 n. 113)

absence of trading through that alternate route, and exposed the fraud.

146.      By June 2007, the investigation was "for all intents and purposes closed without the formalities," without any resolution regarding the dozens of red flags raised by Markopolos. Incredibly, notwithstanding Madoff's lies and the multitude of open questions, the team's Case Closing Recommendation (which was not issued until January 2008) stated that the team had discovered "no evidence of fraud." (A copy of the Case Closing Recommendation is annexed hereto as Exhibit E.)[27] (Report pp. 355-358)

147.      In summary, the SEC's negligence in its handling of Markopolos's 2005 report included, without limitation:

- Transfer of the complaint from the Boston Broker-Dealer team to the New York Enforcement team, when the former had relevant experience and history with Madoff, and the latter did not;

- Assignment of principal duties to a junior staffer with no experience with Ponzi schemes or even basic Broker-Dealer issues;

- Failure to open an MUI, as required by SEC policy and/or practice, for two months after opening the investigation, thereby missing a critical complaint filed with another SEC division;

- Decision by supervisor to engage in personal vendetta against Markopolos due to embarrassment she suffered as a result of her lack of basic knowledge essential to investigation;

- Determination that Markopolos was a "bounty hunter" despite fact that he would be ineligible for a bounty if Madoff was running a Ponzi scheme;

- Determination that Markopolos could not be relied upon because he was not a Madoff insider or client;

- Failure to contact industry professionals Markopolos had referred to the team's supervisor;

- Failure to tailor the team's investigation to the Ponzi-scheme issues at the center of the complaint, and instead directing the inquiry towards registration issues, because that was what the team was experienced in;

- Determination that core issues in the report did not need to be

---

[27]   Despite the fact that the team's supervisor claimed that forcing Madoff to register as an investment adviser was meaningful because he would become subject to increased scrutiny, no further investigation of his investment advisory business was ever undertaken following his registration. (Report p. 350 n. 235)